IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JAMES W. HALL,                          )
                                        )
            Plaintiff                   )
                                        )
    vs.                                 )        CASE NO. CV01-HGD-0940-S
                                        )
STATE FARM INSURANCE CO.,               )
                                        )
            Defendant                   )

**ENTERED**

JAN 0 9 2004

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

## AMENDED MEMORANDUM OPINION

This Amended Memorandum Opinion hereby is SUBSTITUTED for the Memorandum Opinion entered herein on January 2, 2004. The above-entitled civil action is before the court on the motion for summary judgment filed by defendant, State Farm Insurance Company (State Farm) [Doc. #40]. This matter is before the undersigned United States Magistrate Judge based upon the consent of the parties in accordance with 28 U.S.C. § 636(c) and Rule 73, Fed.R.Civ.P.  Plaintiff, James W. Hall, currently proceeding *pro se*,[1] has responded in opposition to the motion for summary judgment [Docs. #44 and 45].[2]  State Farm filed a reply to plaintiff's opposition to summary judgment [Doc. #48], and Hall filed a response to defendant's reply [Doc. #66].  Plaintiff

---

[1] Plaintiff has been represented by several different attorneys during the course of this litigation. All withdrew from representation at one point or another, and plaintiff presently is proceeding *pro se*.

[2] These documents are docketed as motions. However, an examination of their contents reflects that they are responses to defendant's motion for summary judgment.



also filed documents entitled "motion to show that State Farm already had a copy of the rental claim" and a "motion to clarify the lease agreement" [Docs. #67 and 68, respectively]. The court will construe these as supplemental responses to defendant's reply brief.

## STANDARD OF REVIEW

This matter is considered by the court pursuant to the provisions of Rule 56, Fed.R.Civ.P. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). Thus, summary judgment is appropriate where the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law governing the action determines whether an element is essential. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of the pleading, depositions, answers to interrogatories, and admissions on file, if any,

2

which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *see Brown v. Crawford*, 906 F.2d 667, 669 (11th Cir. 1990), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991).

This circuit clearly holds that summary judgment should be entered when the moving party has sustained its burden of showing the absence of a genuine issue of material fact when all the evidence is viewed in the light most favorable to the non-moving party, *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983); *see also, Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512. The evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.[3] *Id*. at 255, 106 S.Ct. at 2514, *citing Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970). It is, therefore, under this standard that the court must determine whether the plaintiff can meet his burden of coming forward with sufficient evidence as to

---

[3] However, the court will not consider bald assertions, unsubstantiated by the record evidence. *See Marsh v. Butler County, Alabama*, 268 F.3d 1014, 1036 n.16 (11th Cir. 2001) (*quoting Mass. School of Law v. American Bar Ass'n*, 142 F.3d 26, 40 (1st Cir. 1998) (a court need not "swallow plaintiff's invective hook, line, and sinker; bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like need not be credited")).

3

each material element of his claim sufficient to permit a reasonable jury to find in his favor.

### FACTUAL BACKGROUND

This matter arises from a fire loss that occurred on March 12, 1995, at rental property located at 3440 Chapel Lane, Hoover, Alabama. At the time of the fire, the residence was insured by State Farm under a rental dwelling policy. The subject fire occurred at approximately 1:00 a.m. in the kitchen of the property. There was fire damage to the kitchen, smoke damage to the remainder of the house, and some water damage to the basement below the kitchen.

After the fire, Hall made a claim for the damage caused. The claim was assigned to State Farm Claim Representative Lori Kissinger. Kissinger inspected the property the following day and prepared an estimate of the cost of repairs. On March 21, 1995, Kissinger met with Hall, provided him with a copy of the State Farm Structural Damage Claims Guidelines, and explained the property claims agreement and replacement cost benefits process. [Defendant's Exh. 3 at Hall/SFF 00578-608]. Under the State Farm policy issued to plaintiff, an insured is entitled to an initial payment of the actual cash value (ACV) of the repairs. The ACV is based on the scope of the work itemized in the property claims agreement and the estimated cost to perform each of the itemized repairs.

4

Once the parties have agreed on the scope of the work, the insured enters into the property claims agreement whereby State Farm tenders the ACV and agrees to later pay the depreciation *if* the insured elects to make repairs, notifies State Farm of his intent to do so within 180 days of the loss, and provides State Farm with documentation to support the claim, such as a signed contract for the repairs. [*Id.* at Hall/SFF 000606-608]. This notification entitles the insured to recover the amount actually spent in excess of the ACV, including depreciation, profit and overhead, to repair the property. *Id.* The agreement, which governs the scope of the work necessary to return the property to its pre-loss condition, specifically warns, in bold letters, that no additions or supplements to the agreement are allowed without the prior approval of State Farm. [*Id.* at Hall/SFF000578].

At the March 21 meeting, Kissinger presented Hall with her estimate of the cost of repairs, itemized in a proposed property claim agreement, showing $29,059.65 as the ACV. [*Id.* at Hall/SFF 000098-100, 000578-608]. Hall disagreed with this estimate. [*Id.* at Hall/SFF 000098]. Kissinger advised Hall that he needed a detailed estimate from his own contractor of the cost of repairs before she could pay more than her estimated ACV. [*Id.*]. Kissinger also advised plaintiff that, if he intended to seek lost rents, she would need a copy of the lease, tax schedules showing rents received, and rent "rolls." Hall claimed, at that time, that he rented the property to Joe Cameron and Mark

Cooley for $1800 a month and that he would provide the necessary verification. [*Id.*].

On March 24, 1995, State Farm records reflect that Hall called Kissinger requesting that she provide him with the names of some contractors from whom Hall could obtain other estimates. Kissinger responded by letter providing the names of three contractors. These were Russell and Alford Builders, Pate & Company, and Howard Rigsby. [*Id.* at Hall/SFF 000516-518]. However, none of these contractors ever provided an estimate for the repair of the subject property. Instead, in May 1995, an estimate was provided by contractor Jack Shewmake for $79,956. [*Id.* at Hall/SFF 000624-626].[4] In a letter dated May 5, 1995, plaintiff provided Shewmake's estimate to Ms. Kissinger. In this correspondence, he asserted that there was a need to replace

---

[4] There is a dispute regarding whether these contractors were provided by State Farm or sought out by plaintiff himself. Plaintiff asserted in his deposition testimony that these individuals were provided by State Farm. [Plaintiff's Depo. at 85]. However, in an earlier recorded statement to State Farm employee Stannon Banks, plaintiff stated that it was he who obtained the estimates from these contractors. [Defendant's Exh. 3 at Hall/SFF 000628]. In a letter written to State Farm in May 1995, he vouches for Shewmake's competence and provides State Farm with Shewmake's phone number. In August 1995, plaintiff submitted the estimates of Ted Allen Construction Company and Gillespie Construction Company and vouched also for their competence, stating:

> The estimates that I have provided you are from competent
> builders who have many years experience in building. . . .
> Further, I have the right to reject any work that is not done
> properly and by selecting one (1) of these contractors they will do
> the work correctly the first time.

[*Id.* at 000488-489]. These are words by plaintiff that directly contradict his claim that the estimates he submitted came from contractors suggested by State Farm. This directly contradictory testimony cannot be reconciled. However, the fact of who proffered Shewmake, Gillespie or Allen as contractors is irrelevant to a determination of the claims at issue here. Therefore, this contradiction, though troubling, does not raise a material factual issue regarding any claim under consideration.

6

sheetrock to get out the odor of smoke and that the roof was damaged due to the heat and would have to be replaced. [*Id.* at Hall/SFF 000512]. Hall vouched for Shewmake's ability and provided State Farm with Shewmake's telephone number. He further requested that State Farm send him a check based on this estimate, less a $1000 deductible, payable *only* to James W. Hall. He also inquired about receiving compensation for lost rents between the date of the fire and the day the property is restored. [*Id.* at Hall/SFF 000514].

Kissinger met with Shewmake on the property in June 1995 to review the proposed scope of work and to attempt to determine why his estimate was so much higher than her own. Records of State Farm reflect that much of the inspection focused on whether the roof needed to be replaced. Kissinger could find no damage related to the fire. Shewmake agreed with her assessment, but he advised Kissinger that Hall was pushing him to repair the roof and he did not want to get in the middle of this dispute. [*Id.* Hall/SFF 000088]. As a result, Kissinger called Hall that afternoon and advised him that, because Shewmake's estimate was so high compared to hers, she would need two more estimates before she could agree to the scope of the work Hall had proposed. [*Id.*].

When Hall had not provided these estimates by June 19, 1995, Hall was contacted by Kissinger to arrange for Russell and Alford Builders to inspect the property and scope of work to determine the reasonableness of the estimates. [*Id.* at Hall/SFF 000086]. Hall refused to let anyone on the property without his presence but agreed to meet with Kissinger and the contractor on June 26.

7

[*Id.*].   On the morning of the scheduled inspection, Hall called Kissinger claiming illness and refused to allow the inspection to go forward on that day. [*Id.*]. The following day, Kissinger wrote Hall and requested that he reschedule a visit or allow her contractor to inspect the property without his presence. [*Id.*]. Hall never responded. State Farm records reflect that, on July 28, 1995, Kissinger wrote Hall again requesting a meeting to have a contractor review the damage. [*Id.* at Hall/SFF 000084].  Hall again failed to respond.

On August 21, 1995, records reflect that Kissinger called Hall again requesting a meeting to inspect the property. [*Id.* at Hall/SFF 000084].  Hall claimed that he had been ill, but he stated that he had obtained estimates from two other contractors. [*Id.*].  On that date, Hall wrote a letter to Kissinger, forwarding the two new estimates he had received. [*Id.* at Hall/SFF 000488-492]. They consisted of an estimate from Ted Allen Construction for $83,682 [*id.* at Hall/SFF 000610-616] and from contractor Chuck Gillespie for $97,914 [*id.* at Hall/SFF 000618-622].

Hall vouched for these builders' competence and advised State Farm that it "can rest assured that the fire and water . . . caused all of these damages." In addition, Hall asserted that because he had provided State Farm with three estimates, he had the "right to request payment for the lowest estimate." [*Id.* at Hall/SFF 000488-492].  Accordingly, Hall demanded payment of $78,956 (the amount of Shewmake's total estimate, including 20% "overhead and profit" of $13,326, less Hall's $1000 deductible). [*Id.*].  Hall reaffirmed this

8

demand in a letter dated September 2, 1995: "I have requested that State Farm Insurance Company pay the amounts (*sic*) of the lowest estimate $79,956 less $1000 deductible or $78,956." [*Id.* at Hall/SFF 000480-486].

On September 25, 1995, Hall again wrote a letter to Lori Kissinger at State Farm soliciting an offer of settlement for $78,956. [*Id.* at Hall/SFF 000468]. State Farm records reflect that Hall advised Lori Kissinger by telephone that he would accept this amount from State Farm in settlement of his claim. [*Id.* at Hall/SFF 000084]. At that time, Kissinger reminded Hall that she had not yet received a copy of a signed lease or any documentation to verify the lost rents Hall had claimed. Records reflect that Hall agreed to supply this information. [*Id.*].

State Farm ultimately agreed to pay Hall based on the Shewmake estimate. On October 23, 1995, Hall came by the State Farm office and picked up the ACV draft in the agreed upon amount from Lori Kissinger. [*Id.*]. In a cover letter to Hall regarding this settlement, Kissinger advised Hall that the payment was for the ACV as a result of the fire less his deductible, based on the Jack Shewmake estimate. [*Id.* at Hall/SFF 000464]. The letter also advised Hall that, once repairs had been made or Hall had provided State Farm with a copy of a signed contract between himself and his contractor, State Farm also would tender the value of the depreciation and the 20% overhead and profit that would be payable to the contractor. Kissinger also again requested that

9

Hall provide her with any copy of a lease agreement regarding this property, which she stated she needed before she could calculate lost rents. [*Id.*].

Kissinger attached a copy of the applicable Property Claims Agreement (PCA) which detailed the actual items covered by the claim. [*Id.* at Hall/SFF 000542-576]. The PCA states, in capital letters as follows:

> ALL AMOUNTS PAYABLE ARE SUBJECT TO THE TERMS, CONDITIONS, AND LIMITS OF YOUR POLICY.
>
> ****NOTICE**** NO ADDITIONS OR SUPPLEMENTS WITHOUT PRIOR AUTHORIZATION FROM STATE FARM INSURANCE COMPANIES.

[*Id.* at Hall/SFF 000542 (capitalization in original)]. In addition, during the October 23, 1995, meeting, Kissinger again discussed all of the above issues outlined in her letter, including the PCA and Replacement Cost (RC) processes, as well as what Hall needed to do to obtain the remaining overhead and profit. [*Id.* at Hall/SFF 000084].

In March 2000, Hall sent a copy of a letter he now asserts that he originally wrote and sent to State Farm on December 18, 1995, which was addressed to Lori Kissinger at State Farm, stating that the contractor who submitted the bid to him, for which he had been paid, had taken a job out of town and could not perform the repairs to his home.[5] The letter further stated that, as a consequence, Hall had contacted other contractors and learned that

---

[5] Shewmake has denied that Hall ever contacted him about performing the repairs to the dwelling. [Defendant's Exhibit 3 at SFF/Hall 000670-672].

additional repairs would be necessary.  He then listed items which he claimed needed repairs and asserted that the best estimate for which he could get the work done was for $157,653.  He requested payment of that amount from State Farm.  [*Id.* at Hall/SFF at 000394-402].

The policy of insurance which covered the dwelling sets out certain conditions of coverage.  With regard to loss settlements, it states, in pertinent part, as follows:

> **Loss Settlement.** Covered property losses are settled as follows:
>
>                \* \* \*
>
>    c.  Buildings under Coverage A (dwellings) at replacement cost without deduction for depreciation, subject to the following:
>
>    (1)  \* \* \* \*
>
>    (2)  We will pay the cost of repair or replacement, without deduction for depreciation, but not exceeding the smallest of the following amounts:
>
>        (a)  the limit of liability under this policy applying to the building.
>
>        (b)  the replacement cost of that part of the building damaged for equivalent construction and use on the same premises; or
>
>        (c)  the amount actually and necessarily spent to repair or replace the damaged building.
>
>    (3)  \* \* \* \*

11

>　　　　(4)　　You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis and then **make claim within 180 days after loss for any additional liability on replacement cost basis.**

[Defendant's Exh. 6 at Hall/SFF 000260] (emphasis added).

Although State Farm denies it received or was aware of Hall's letter dated December 18, 1995, until March 2000, a letter serendipitously was sent to plaintiff by Lori Kissinger on January 24, 1996, which was coincidentally relevant to the plaintiff's December 18 letter.  [Defendant's Exh. 3 at Hall/SFF 000462].  Although nowhere does her letter specifically state that it was in response to Hall's December 18, 1995, letter, Kissinger does state, in pertinent part, as follows:

>This letter is to update you on the status of this claim file.　　If you wish to obtain payment for any **replacement cost benefits** and/or overhead and profit that might be owed to your general contractor, please refer to the Property Claims Agreement that was given to you on October 23, 1995.  This form states that we will need either invoices, receipts or other documentation such as a contract between you and the contractor stating the amount of the repairs, before any additional payment can be made . . . .

>Also, to date, we have yet to receive any documentation to verify you (*sic*) loss of rents.  The type of documentation needed, before any payment can be made to you for this loss, is a lease agreement between you and the tenants and your tax records supporting this income amount . . . .

> I will no longer be the claims adjuster handling your file due to I am going to another department within State Farm . . . . Once we receive the above requested information, you (*sic*) file will be reassigned to another adjuster and will be considered for payment . . . .

[*Id.* at Hall/SFF 000462 (emphasis added)].

No further written correspondence was received from Hall for several years after this letter was sent to him. Although Hall claims to have made numerous phone calls to State Farm over the next several years, he cannot recall who he spoke with and State Farm has no record of any such calls. [*Id.* at Hall/SFF 000108]. During his deposition, the following exchange occurred:

> Q.   In fact, after – the day after January 1996, some three years passed before you had any further communications with State Farm?
>
> A.   No. I called probably a hundred times out there.
>
> Q.   With whom did you talk?
>
> A.   Well, I'm not sure offhand, but I called several times is all I know.

[Defendant's Exh.1, Plaintiff's Depo., at 108].

In his affidavit submitted in opposition to State Farm's motion for summary judgment, Hall now claims, despite his prior testimony and without explanation, that the people he spoke with on these occasions were Lori Kissinger, Stannon Banks and David Everest.[6] [Defendant's Exh. 5, Affidavit of

---

[6] As discussed *infra*, State Farm agrees that plaintiff did have several telephone conversations with Stannon Banks beginning in 1999; however, there is no indication in the record other than plaintiff's contradictory assertion that any such conversations took place in the time period from January 1996 to June 1999.

James W. Hall, at 15]. The law in this circuit is that a party cannot give "clear answers to unambiguous . . . questions" in a deposition and thereafter raise an issue of material fact by giving contradictory sworn testimony that fails to explain the contradiction.   *Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).   When this occurs, the court may disregard the contradictory testimony as a sham. *Id.* at 658-59. In any event, even assuming the calls occurred, Hall has provided no evidence of the substance of these conversations. It cannot be assumed that any relevant information was transmitted to State Farm during these calls which Hall asserts took place prior to June 1999.   Furthermore, there also is no admissible evidence that Hall made contact with State Farm by mail after December 18, 1995, until June 1999.[7]

After 1995, the next letter which was received by State Farm from plaintiff was one dated June 11, 1999, wherein Hall requests payment of "the balance of the subject claim plus loss of rents." State Farm reopened Hall's claim file "for replacement cost benefits" and it was reassigned to State Farm Claims Representative Stannon Banks.   [Defendant's Exh. 3 at Hall/SFF 000138].

Upon receiving this assignment, Banks tried on several occasions to reach Hall by telephone but was unsuccessful. [*Id.* at Hall/SFF 000460]. Accordingly,

---

[7] Certain letters purportedly written by Hall during this period were stricken by the court by separate order. *See infra* at n.13.

14

Banks wrote a letter to Hall on July 14, 1999, asking Hall to contact him to discuss Hall's claim. [*Id.* at Hall/SFF 000080, 454]. On July 27, 1999, Hall called Banks to discuss the paperwork necessary for a supplemental payment of additional costs that Hall claimed to have incurred. [*Id.* at Hall/SFF 000080]. Banks advised Hall that for the additional repairs to be covered, the damage must have resulted from the fire and be necessary to return the dwelling to the pre-loss condition. [*Id.*]. Banks reaffirmed the need for further documentation for the additional repairs in a letter to Hall dated July 28, 1999. He also stated that, upon receipt of this information, he would contact the contractor to determine the necessity of this work, which was not included in Jack Shewmake's original estimate. [*Id.* at Hall/SFF 000450].

State Farm heard nothing further from Hall for three months. State Farm records reflect that on October 14, 1999, Hall came by the State Farm office and wanted a check for repairs and wanted it delivered the following day. [*Id.* at Hall/SFF 00080]. On the following day, Hall called the State Farm office and again requested a check for repairs. He was told by Banks that Banks could not assist him at that time but that, with further information from the contractor and a site inspection, State Farm would be closer to making a payment, if one was necessary. [*Id.* at Hall/SFF 000078].

State Farm heard nothing further from Hall or anyone else regarding his claim until December 10, 1999, when a person, identifying himself as contractor for Hall, called State Farm asking for "his money." [*Id.*].   This person,

15

subsequently identified as Lance Isbell, told Banks that he had put over $100,000 into the repair of the dwelling and that he needed payment. [*Id.*]. Banks informed Isbell that he could only deal with the insured, Mr. Hall. [*Id.*]. Three days later, Isbell appeared at the State Farm office demanding payment. [*Id.*]. Banks once again informed him that State Farm could deal only with Hall. [*Id.*].

Banks met with Hall on December 14, 1999, to discuss whether additional monies were due. [*Id.*]. Banks explained that, under the PCA which had been provided to Hall in 1995 along with the settlement check, no additions or supplements were allowed without the prior approval of State Farm Insurance. [*Id.*]. However, because Hall now apparently had a contractor hired to do the repair work, State Farm was willing to pay the depreciation, profit and overhead previously withheld. Accordingly, State Farm presented Hall with a draft for $15,710.04 on December 14, 1999, for these benefits. [*Id.*].

Banks also discussed the issue of lost rents with Hall. Hall was advised that he still would be given the opportunity to obtain payment for lost rents if he would provide documentation, including a copy of the lease agreement and documents to verify that rents had actually been paid or were owed. [*Id.* at Hall/SFF 000078, 448]. This request was confirmed by a letter from Banks to Hall dated December 14, 1999. [*Id.* at Hall/SFF 000448].

In a letter dated December 14, 1999, received by State Farm on January 17, 2000, Hall attempted to justify further payment by claiming that

16

the estimates submitted in 1995, presumably including the one he accepted,

"did not include damages by water when the fire was extinguished." [*Id.* at

Hall/SFF 000442-446]. However, in a letter to State Farm dated August 21,

1995, in which Hall provided the two additional estimates for the repair of the

dwelling previously requested by State Farm, Hall asserted a claim for water

damage stating, in pertinent part, as follows:

> While you have told me that you do not agree with all
> of subject damages, you can rest assured that the fire
> and the water that was necessary to extinguish the fire
> caused all of these damages.

> * * *

> In addition, the tile ceiling was damaged by the heat
> and by water that was used to extinguish the fire.

[*Id.* at Hall/SFF 000488-490]. In a September 2, 1995, letter to State Farm,

Hall again asserted a claim for water damage and stated as follows:

> The water that was used to extinguish the fire caused
> the ceiling tile to be damaged as water was all over the
> upstairs when the fire was extinguished. This water
> drained down through the upstairs into the first floor
> ceiling below. Therefore, this is why the ceiling tile is
> damaged.

[*Id.* at Hall/SFF 000483]. Likewise, the Shewmake estimate, which State Farm

subsequently paid, lists, among many items, the cost for the replacement of

ceiling tiles and carpet in the basement of the dwelling. [*Id.* at Hall/SFF 000624-626].[8]

In his December 14, 1999, letter, Hall also asserts for the first time that the house "was burned out (gutted) with fire on the inside and destroyed by water that it took to put out the fire." [*Id.* at Hall/SFF 000446]. In this letter, he asserts that "all that was left [of the house] was the framing less the part that was burned." [*Id.*]. He also adds a claim that "the actual cost to restore the house is the total building costs of subject residence (approximately 4000 s.f. plus double garage and 264 s.f. sunroom) less the framing costs except for items that were replaced in the framing." [*Id.*]. According to Hall, the total replacement cost would exceed $225,500, rather than the $79,956 he initially claimed pursuant to the Shewmake estimate. However, he declined to provide a specific dollar amount for the replacement cost of the residence, stating that "there was no way to furnish an accurate estimate for fire damages unless the building was a complete or total loss." [*Id.*].

On February 8, 2000, Banks and his Team Leader, David Everest, inspected the property to determine if any additional monies were owed. Banks found the property to be in general disrepair and could not verify what work, if any, had been done that related to the 1995 fire. [*Id.* at Hall/SFF 000072-74].

_____

[8] In fact, *all* estimates, including the one prepared for State Farm by Kissinger, included repairs to the ceiling and replacement of the carpet in the basement that showed water damage. [*See* Defendant's Exh. 3 at Hall/SFF 000542-626].

On February 15, 2000, Banks called Hall and asked, among other things, how much rent he charged. On this occasion, Banks' records reflect that Hall orally advised State Farm he charged $1950 per month for rent. [*Id.* at Hall/SFF 000070]. Banks again requested documentation to verify that such a lease existed and that Hall actually received or was owed rental payments from his tenants. [*Id.*]. This conversation was memorialized in a letter bearing the same date. Banks advised Hall that State Farm would pay him for lost rents based on the documents, such as a lease or tax documents, which were to be provided by Hall and on the "merits of the loss."

Banks also advised Hall that he would contact Hall's current contractor, Lance Isbell, to gain information on the work begun/completed on the subject property. [*Id.* at Hall/SFF 000432]. Banks attempted to contact Isbell at a number provided by Hall but was told by a relative of Isbell that Isbell would not talk to him. Banks was never able to discuss with Isbell the estimate he purportedly prepared. [*Id.* at Hall/SFF 000068].

Banks received another letter from Hall on February 16, 2000. On this occasion, Hall asserted that the cost of repairs was in excess of $137,000 and that he would forward the documentation of this to Banks when found. [*Id.* at Hall/SFF 000428-430]. Hall again asserts that the property was gutted in the fire and that "it would cost close to $300,000 to build a new house like this," and that his current demand of a "little more than $137,000 is a very

19

reasonable amount to do the work that will be required to complete the repairs caused by the fire."  [*Id.*].

On March 10, 2000, Banks and Everest met with Hall to discuss his claim. [*Id.* at Hall/SFF 000066].  At this meeting, Hall produced a document from Lance Isbell for the "Hall Job" which reflected an amount due of $157,653.  [*Id.* at Hall/SFF 000536].  However, this document was not dated, nor was it itemized for unit costs.  [*Id.*].  Likewise, Hall did not provide any explanation for how this proposed work differed from the scope of the work proposed by Jack Shewmake.  [*Id.*].  Hall admits that he entered into the agreement with Isbell to perform repairs without first informing State Farm.  [Hall Depo. at 121-22].  Hall provided no evidence of lost rents at the March 10 meeting. [Defendant's Exh. 3 at Hall/SFF 0000066].

On March 23, 2000, Banks called Hall to again request information to support his claim for loss of rents.  [*Id.* at Hall/SFF 000064-66].  Banks also informed Hall that State Farm would not pay any additional money for repairs beyond that agreed upon in 1995.  [*Id.*].  This conversation was memorialized in a letter from Banks to Hall on March 24, 2000.  [*Id.* at 000414].  More or less simultaneously, Hall wrote a letter to Banks, also dated March 24, 2000, attaching a copy of the letter which he purportedly wrote to State Farm on December 18, 1995, that outlined the alleged inadequacies of the Shewmake estimate, and a copy of what Hall purported was a lease for rental of the subject property.  That lease, as submitted in the record by State Farm, is

signed by a Joe Cameron and reflects a rental rate of $1950 per month. [*Id.* at Hall/SFF 000390-412].[9]

State Farm subsequently submitted evidence strongly indicating the lease for $1950 per month was fraudulent. Hall responded to this allegation by asserting that the March 24, 2000, letter contained a lease for $1800 between himself as lessor and Joe Cameron as lessee, with Mark Cooley as guarantor, and not a $1950 lease between himself and Cameron alone. Hall denied, under oath, any knowledge of the $1950 lease, even though it is in the same handwriting (presumably Hall's) as the $1800 lease he now claims is the lease-copy he executed with Cameron and Cooley and provided to State Farm on March 24, 2000. [Doc. #44, Plaintiff's Opposition to Summary Judgment, at 26-29; Plaintiff's Exh. 5, Affidavit of James W. Hall, at 2, 7].

---

[9] State Farm asserts that this was the first time it ever had seen the letter of December 18, 1995. [Defendant's Exh. 3 at Hall/SFF 000064]. During her investigation, the tenants of this dwelling advised Lori Kissinger that Hall allowed them to live in the house rent free for one year in exchange for giving Hall a 25% interest in the tenants' paging business. [*Id.* at Hall/SFF 000100]. Hall, while acknowledging that he may have paid some licensing fees for Cameron's business, denied, in a recorded statement and later at deposition, that he had an interest in Cameron's corporation. [Hall Depo. at 70-71]. However, records of the Alabama Secretary of State reflect that Hall is the registered agent for Premier Radio and Paging and list the tenants, Joe and Catherine Cameron, as the officers of that company. [Defendant's Exh. 4]. The address given for Premier Radio and Paging is the address of the subject property, 3440 Chapel Lane, Hoover, Alabama. [*Id.*].

Despite this conflicting evidence, for summary judgment purposes, the court must view the evidence in the light most favorable to the non-moving party. Thus, it is assumed that the December 18, 1995, letter was, in fact, sent to State Farm by Hall, regardless of whether it was actually received. A credibility determination regarding whether this letter is real or a fabrication, while tempting in light of plaintiff's other unreconcilable contradictory assertions outlined herein, can be made only by a jury and is not appropriate at the summary judgment phase of this proceeding.

21

However, as is explained *infra*, a determination regarding which lease was submitted by Hall to State Farm and whether either is genuine, is unnecessary to reach a decision regarding State Farm's motion for summary judgment. The court is concerned about the possibility that a false document was submitted to State Farm by Hall in support of his quest for the payment of lost rents and that, in denying under oath that he ever provided State Farm with this document, Hall may have presented perjured testimony to the court. Though ultimately of no consequence in regard to the court's final decision on the motion for summary judgment, it was obviously necessary for State Farm to expend time and effort to address this issue. Nevertheless, this issue is the subject of a separate proceeding and is not directly addressed herein.[10]

─────────────────────

[10] Evidence submitted by State Farm reflects that in late 1999, Hall commenced a lawsuit against two individuals, Joe Cameron and Mark Cooley, in Jefferson County (Bessemer Division) Circuit Court alleging that Cameron failed to pay rent owed to him for the subject property under a lease in effect at the time of the fire and that Cooley had signed the lease as a guarantor for Cameron. The court filing (in Jefferson County) included a copy of the purported lease for the property. [Defendant's Exh. 5]. However, the lease filed by Hall with that lawsuit is an entirely different lease than the one State Farm asserts was provided to it by Hall on March 24, 2000. The lease filed with the Jefferson County lawsuit names **Cameron *and* Cooley** as responsible parties and covers a period from September 1, 1993, to August 31, 1995. Rent is $1200 per month for the period from September 1, 1993, to August 1, 1994, and $1800 per month from September 1, 1994, to August 31, 1995. [*Id.*]. The lease that State Farm asserts Hall presented to it in his letter dated March 24, 2000, covered a time period from October 1, 1994, to September 1, 1996, provided for $1950 rent and was signed by **Cameron *only*.** [Defendant's Exh. 3 at Hall/SFF 000404-412].

However, as noted above, Hall now denies that the $1950 per month lease is a lease he ever provided to State Farm. [Doc. #44, Plaintiff's Opposition to Summary Judgment, at 26-29; Plaintiff's Exh. 5, Affidavit of James W. Hall, at 2, 7]. The lease Hall now asserts as the only one he has ever provided State Farm is the one subject to the Jefferson County lawsuit in which Hall allegedly leased the subject property to Joe Cameron and Mark Cooley for $1800 per month.

However, other evidence, including some proffered by Hall himself, contradicts Hall's assertion that he did not provide State Farm with the apparently-false $1950 per month lease as proof of his lost rents in his March 24, 2000, letter to State Farm. In a brief filed on August 15, 2001, in opposition to a motion to dismiss filed earlier in this action by State Farm, then-counsel for plaintiff, Stan Brobston, stated on behalf of Hall that **"Plaintiff submitted**

22

On April 6, 2000, after receiving the copy of the lease showing a monthly rental of $1950, State Farm requested additional information to confirm that rents were actually paid or owed. [*Id.* at Hall/SFF 000386]. To this end, State Farm requested plaintiff's tax records for 1995. Because Hall claimed that he could not locate these records, State Farm provided him with a release which would have allowed State Farm to independently obtain this information. [*Id.*

---

**proof** to State Farm of the fair rental value of **one thousand nine hundred and fifty dollars ($1950) *in the form of a lease*** which, to Plaintiff's information and belief, remains in the exclusive possession of the Defendant." [Doc. #10, plaintiff's opposition to summary judgment, filed August 15, 2001 (emphasis added)].

In addition, after receipt of Hall's March 24, 2000, letter, including the now-questioned document, State Farm advised Hall by letter on April 6, 2000, that the ($1950) lease provided to State Farm by Hall on March 24, 2000, was, standing alone, insufficient to justify payment of lost rents. In this letter, State Farm **specifically** noted that the lease provided by Hall reflected a contract with Joe Cameron (and no one else) for **$1950** per month. State Farm requested additional information to confirm that rents were actually paid or owed. [*Id.* at Hall/SFF 000386]. To this end, State Farm requested plaintiff's tax records for 1995. Because Hall claimed that he could not locate these records, State Farm provided him with a release which would have allowed State Farm to obtain this information independently. In this letter, State Farm again references Hall's assertion that the rental value of the property was $1950 per month. [*Id.* at Hall/SFF 000378-380].

Hall never provided the requested tax information or signed the release. However, on April 8, 2000, Hall wrote a letter to State Farm acknowledging receipt of State Farm's April 6, 2000 letter. He further acknowledged that he had provided State Farm with a copy of a lease in his March 24, 2000, letter to State Farm and demanded payment for lost rents based on that document. [*Id.* at Hall/SFF 000382-384]. Nowhere in Hall's letter to State Farm does he advise State Farm that the $1950 per month lease with Cameron, referenced by State Farm in its April 6, 2000, letter to Hall as a document provided to it by Hall, was not, in fact, a document that he had sent them. The letter also never mentions Mark Cooley as a signatory to this agreement. Furthermore, in a taped statement given by Hall and recorded by Stannon Banks for State Farm on June 8, 2000, Hall, when asked, denies knowing Mark Cooley despite his then-ongoing lawsuit against Cooley in state court. [*Id.* at Hall/SFF 000640]. Thereafter, in a July 1, 2000, letter to State Farm, Hall requests that State Farm not give anyone else a copy of this ($1950 per month) lease. [*Id.* at Hall/SFF 000330]. Consequently, the evidence strongly reflects that Hall's claim that he never provided the $1950 lease to State Farm is patently false and that he made false statements in evidentiary submissions in an attempt to cover up for having provided fraudulent information to State Farm while attempting to collect on his claim. Hall has been sanctioned in the past for providing false evidence regarding an insurance claim. This resulted in an award of attorney's fees to the opposing party under the Alabama Litigation Accountability Act. *Hall v. American Indemnity Group*, 681 So.2d 220 (Ala.Civ.App. 1996). Plaintiff's actions call into question the authenticity of *both* leases.

23

at Hall/SFF 000378-380]. Hall never provided the requested tax information nor the signed release.

Beginning on or about April 26, 2000, Banks conducted an investigation of the fair rental value of the property for State Farm and obtained an opinion that it ranged from $750 to $1000 per month. [*Id.* at Hall/SFF 000062]. Banks paid Hall the upper end of these amounts, $12,000, representing a rental value of $1000 per month for the full 12 months as provided in the policy.  [*Id.*]. Banks also informed Hall that if he could establish that the rental value was higher, State Farm would consider additional payment.   [*Id.* at Hall/SFF 000376].  Hall accepted the payment of $12,000 and never provided any additional information beyond the now-questioned $1950 lease.

On July 10, 2000, and again on October 23, 2000, State Farm advised plaintiff that it would not pay any additional money to him for his claimed losses.  [*Id.* at Hall/SFF 0003236-328, 000298].  Thereafter, this litigation commenced.[11]

---

[11] Hall's policy sets the following condition regarding suits against State Farm:

> **8. Suit Against Us.** No action shall be brought unless there has been compliance with the policy provisions and the action is started within one year after the date of loss or damage.

[Defendant's Exh. 6 at Hall/SFF 000260]. The statute of limitations for a fraud or suppression claim in Alabama is normally two years. § 6-2-38, *Alabama Code* (1984); *Kelly v. Connecticut Mutual Life Ins. Co.*, 628 So.2d 454 (Ala. 1993). The statute of limitations for a breach of contract action for a writing under seal is 10 years, § 6-2-33, *Alabama Code* (1975), or six years for a breach of contract action for a writing not under seal. § 6-2-34(4), *Alabama Code* (1975).

However, under Alabama law, "any agreement or stipulation, verbal or written, whereby the time for commencement of any action is limited to a time less than that prescribed by law for the commencement of such action is void." § 6-2-15, *Alabama Code* (1975). *See also*

**DISCUSSION**

## Breach of Contract/Bad Faith Claims

In *Employees' Benefit Ass'n v. Grissett*, 732 So.2d 968 (Ala. 1998), the Alabama Supreme Court stated that in order to establish that a breach of contract has occurred, a plaintiff must prove: "'(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages.'" *Id.* at 975 (quoting *Southern Med. Health Sys., Inc. v. Vaughn*, 669 So.2d 98, 99 (Ala. 1995) (citations omitted)). Even without consideration of the strong evidence of fraud on the part of plaintiff in this case, there is no evidence that State Farm breached its contract of insurance with Hall. Under the policy of insurance, it agreed to pay for certain damages if they occurred and it did so. Specifically, State Farm paid Hall for ACV, overhead, and lost rents based on information provided to State Farm by Hall. It did not pay Hall additional amounts claimed by him because Hall did not provide the required documentation or obtain State Farm's prior approval, or he otherwise failed to satisfy conditions of the policy for payment.

Likewise, to prevail on a claim of bad faith refusal to pay insurance policy benefits, Hall must show that the insurer lacked any reasonable or arguable reason for its refusal to pay. *Miller v. Preferred Risk Mutual Ins. Co.*, 572 So.2d

---

*Honeywell, Inc. v. Ruby Tuesday, Inc.*, 43 F.Supp.2d 1074, 1078 (D.Minn. 1999); *McCallum v. Buccaneer Homes of Alabama, Inc.*, 826 F.Supp. 420, 422 n.2 (M.D.Ala. 1993). Presumably, this is why defendant fails to mention this policy provision.

25

1260, 1262 (Ala. 1990). The insurer need not demonstrate that its claim decision was correct, only that it was reasonably legitimate or arguable. *Adams v. Auto-Owners Ins. Co.*, 655 So.2d 969, 971 (Ala. 1995).

It is undisputed that State Farm paid Hall $79,575.20 on the dwelling loss and another $12,000 for lost rents. Hall demanded, and was paid, the amount of the lowest of three estimates he provided to State Farm. Under Alabama law, the payment of policy proceeds is strong evidence that negates a claim for bad faith. *Bowers v. State Farm Mut. Auto. Ins. Co.*, 460 So.2d 1288 (Ala. 1984); *Neal v. State Farm Fire & Cas. Co.*, 908 F.2d 923, 926 (11th Cir. 1990). If any party to this litigation is guilty of bad faith, it is not State Farm. Consequently, it is entitled to judgment in its favor as a matter of law.

Plaintiff asserts that, after receiving his initial payment for damages, he advised State Farm in December 1995 that he was entitled to still more money. However, he never provided State Farm with sufficient information for it to make a determination of the validity of the supplemental claim. Under the contract of insurance, Hall had 180 days from the date of the loss to request additional payment. [Defendant's Exh. 6 at Hall/SFF 000260]. Even assuming Hall's letter of December 1995 to be genuine and that he was never paid for water damage occurring as a result of extinguishment of the fire, Hall never took the steps necessary to document that he suffered additional, compensable loss. He clearly never did so within the allotted 180 days. The $157,653 estimate (the "Isbell estimate") for repairs referenced and allegedly included

26

with the December 18, 1995, letter to Lori Kissinger is not itemized for unit cost and undated.  There also is no explanation regarding how or why it differed from the Shewmake estimate for which Hall previously was paid.[12]

Furthermore, Hall was advised by State Farm in January 1996 that if he believed that he was due more money on his claim, he needed to provide "either invoices, receipts or other documentation such as a contract between you and the contractor stating the amount of the repairs, before any additional payment can he made." [Defendant's Exh.3 at Hall/SFF 000462].  State Farm received no further correspondence from Hall until mid-1999.[13]  Hall asserts, nevertheless, that he had telephone conversations with persons at State Farm

_____

[12] As noted above, State Farm asserts that it did not receive a copy of this purported estimate until March 10, 2000, when Hall provided State Farm with this document, supposedly authored by contractor Lance Isbell, giving an estimate of $157,563 for performing repair work to the subject dwelling.  [Id. at Hall/SFF 000536].

[13] After State Farm filed its brief in support of summary judgment, Hall submitted several letters, one addressed to Lori Kissinger and five addressed to "Gentlemen" at State Farm (as opposed to any of the other specific individuals with whom plaintiff had been dealing).  The letters, purportedly written by Hall between January 1996 and November 1998, were submitted by him to show that he had written letters to State Farm about the status of his claim to which they had not responded.  The first letter, addressed to Kissinger, also references the Isbell estimate of $157,653.  It was not produced to defendant at or before Hall's deposition.  Hall was questioned during his deposition, in detail, concerning the identity of any documents which he may possess but did not bring with him to the deposition.  He testified that the ones he produced on that day were all he had except for certain other letters to Stannon Banks, Charles Woods and Jack Shewmake.  [Plaintiff's Depo. at 49-50, 51-52, 55-56, 109].  After providing these letters at a point too late in the proceedings for State Farm to effectively challenge them, Hall attempted to avoid State Farm's motion to strike them by contradicting his prior sworn testimony and asserting that he had possessed other letters which were not turned over at his deposition.  However, he asserts, without proof, that they should still be considered because, *inter alia*, he mailed these letters to the London & Yancey law firm before his deposition and, therefore, it was not necessary for him to have produced them earlier.  State Farm denies that it received them.  Because of Hall's unexplained, contradictory testimony and the fact that these letters were never identified or produced during discovery and did not make an appearance in this case until plaintiff filed them in opposition to defendant's motion for summary judgment, these documents were ordered stricken from the record and are not considered by the court.

27

concerning his claim after December 1995.  [Plaintiff's Exh. 5, Affidavit of James W. Hall, at 27, 32; Plaintiff's Depo. at 108].  However, he has provided no evidence of the substance of these conversations.  Therefore, there is no evidence that he provided State Farm with any of the information which State Farm was entitled to receive under the policy before it would have been required to make further payments.[14]

Not surprisingly, State Farm found Hall's claim, now set at $157,563 and standing alone, unexplained and unsubstantiated, insufficient to justify the payment of further monies to plaintiff.  Despite numerous attempts by State Farm to obtain more detailed information from Hall after he re-initiated contact with it in 1999, he was never forthcoming with the requested details of his claim.  State Farm is not required to take Hall's undocumented assertion that he is due more money at face value, especially when, as is the case here, what little information he provided was insufficiently documented, of questionable veracity and frequently contradictory.[15]  An insurer's obligation to pay or to evaluate the validity of an insured's claim does not arise until the insured has complied with the terms of the contract with respect to submitting claims.

---

[14] It is interesting to note that State Farm has no record of even one of these phone calls until mid-1999 just as it has no records of the correspondence, previously stricken, allegedly sent by Hall to State Farm during this same time period.

[15] For instance, Hall claims at one point that fire and water damaged only the kitchen, the roof above it and the room below it, along with smoke damage in other areas of the residence. He later asserts that the house was "gutted" by the fire and that it would be cheaper to rebuild it than to repair it.  The ever-changing cost of the repairs is documented *infra*.

*Nationwide Ins. Co. v. Nilsen*, 745 So.2d 264, 267 (Ala. 1998) (citing *United Ins. Co. of America v. Cope*, 630 So.2d 407, 411 (Ala. 1993). Hall was required to submit detailed, itemized information to State Farm outlining the items or repairs for which State Farm was paying. He also was required to demonstrate that the amount sought was for repairs related to the original fire. He never did this.

Hall admits also that he is attempting to collect payment for supplemental work performed on the dwelling without prior approval by State Farm as required under the policy, thereby making it impossible for State Farm to determine if the work covered damages caused by the 1995 fire. This also is a violation of clear terms of the policy, which were brought to Hall's attention before he ever made the supplemental claim. Because it is undisputed that the policy required Hall to obtain prior approval before performing any additional repairs on the property over those outlined in the Shewmake estimate and that he did not do so, he failed to comply with a condition precedent to recovery under the contract for those repairs.

The same is true with regard to Hall's claim for lost rent. He was paid $12,000 for lost rents. He accepted this payment when proffered and only later asserted that he was entitled to more money. He claimed another $9600 was due him by State Farm. His only documentation was a lease of questionable authenticity produced long after the fire. There is no evidence that any rent in excess of $1000 per month, whether $1800 or $1950, was a reasonable rental

value for the property.  In any event, State Farm did not refuse to pay additional rent money.  It requested further documentation, such as receipts or tax records, as proof that Hall had actually suffered a loss.  Hall's refusal to provide such information was a violation of the undisputed terms of the policy.

Therefore, because it is undisputed that Hall failed to perform conditions precedent required under the policy, State Farm is entitled to summary judgment on plaintiff's breach of contract claim. *See Nilsen*, 745 So.2d at 269.

Likewise, because State Farm is entitled to a judgment on Hall's breach of contract claim, summary judgment is also appropriate with regard to Hall's bad faith claim.  Generally, to prevail on a claim alleging bad faith refusal to pay, the plaintiff must be entitled to a directed verdict on the underlying contract claim. *Id.* Thus, the court concludes that the failure of State Farm to pay all of plaintiff's claims was not an act of bad faith, nor is there any evidence to support a cause of action for breach of contract.  The evidence reflects that State Farm bent over backwards in an attempt to accommodate Hall.  Its efforts led to naught.

A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this _____ day of January, 2004.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE

30